## THE ESPARTA.

(Circuit Court of Appeals, Fifth Circuit. February 25, 1908.)

No. 1,723.

COLLISION—STEAM VESSELS MEETING ON MISSISSIPPI—VIOLATION OF RULES.

The United States lighthouse tender Magnolia, proceeding down the Mississippi from New Orleans at night with the President on board, when 60 miles below the city, came into collision with the steamer Esparta, coming up. When at about Sixty-Mile Point, on the west bank, the Magnolia saw the green and range lights of the Esparta at Dick Wright's Point on the east side, 3 miles distant, and gave her a signal of two whistles, which was not heard. Receiving no answer, the Magnolia repeated the signal which was heard, and answered by the same signal, although the answer was not heard by the master of the Magnolia, and was misunderstood by some of the other officers. After the vessels had approached to within perhaps a quarter of a mile of each other, the Esparta, then showing both her side lights, the Magnolia gave a signal of one whistle and ported her helm. The Esparta answered by two whistles and starboarded, and both immediately reversed and sounded alarm whistles, but the collision occurred almost immediately, the vessels being close to the west bank. There is a bend in the river between the two points, and it was the custom, known to all parties, for vessels going down to keep in the middle of the stream, and for vessels coming up to cross over to the west side at Dick Wright's Point to avoid the current, and to follow the curving west bank until passing Sixty-Mile Point. This course was followed by the Esparta to the time of collision. When the first two signals were given the Magnolia was near the middle of the river, but in some manner worked over to the west side. *Held*, that the vessels were not approaching head on so as to render the rule for passing port to port applicable; that the first signals of the Magnolia were proper, and that she was in fault for crossing them, and also for getting out of her proper course, and for not slowing to steerageway as required by rule 3 of the pilot rules, when, as he testified, her master became uncertain as to the course of the Esparta; that upon the evidence from the Magnolia alone the Esparta was not in fault, but kept her proper course, and could not have avoided the collision.

[Ed. Note.—Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

Appeal from the District Court of the United States for the Eastern District of Louisiana, in Admiralty.

The following is the opinion of SAUNDERS, District Judge, in the District Court:

This is a suit for damages caused by a collision that took place on October 26, 1905, between the steamship Esparta and the lighthouse tender Magnolia, owned by the libelant, at that time carrying the President of the United States from New Orleans to the mouth of the river.

1. The libel avers that on October 26, 1905, at about 10:50 p. m., the Magnolia, being then properly officered, manned, and equipped in every respect and properly navigated, was proceeding down the Mississippi river at a speed of about 13½ miles an hour; that the night was dark but clear; that, at a point about 60 miles below New Orleans, the Magnolia was running near the middle of the river, but a little nearer the right or west bank, with all her lights properly set and burning in the positions required by law, and with her master, first and second officers, and quartermaster on deck, and an experienced sailor on the lookout on the forward deck; that, at said point, the officers of the Magnolia sighted a steamer (subsequently ascertained to be the Esparta) about 2½ miles off, coming up the river; that said steamer was about two points on the starboard bow of the Magnolia, and her green and

160 F.—19

range lights were visible to the Magnolia; that there was a bend in the river at this particular point, and that it was a pilot custom for ascending boats to cross to the right bank, at this point; that the master of the Magnolia caused two loud blasts of her steam whistle to be sounded, to indicate his intention of passing to starboard (i. e., on the east side of the Esparta), and, receiving no answer, after a short interval, repeated said signal, still without answer; that "the ships having rapidly approached each other, and being at this time only several hundred yards off, and the lights of the said ship Esparta indicating that she was dead ahead and coming almost head on, the master of said ship Magnolia blew one blast of his steam whistle, ported the helm and stopped the engines, and, not hearing any answer, sounded the danger signal, or four blasts, which was answered by two blasts, and reversed his engines full speed astern, endeavoring to avoid the collision"; that the Esparta "instead of putting her helm to port, as was her duty, and as had been indicated by the signals exchanged, on the contrary put her helm astarboard, and ran into and collided with the Magnolia, with great force and violence," and thereby caused the damage herein complained of; "that said collision was caused solely by the gross carelessness and negligence of the master and crew of the said ship Esparta in not keeping the proper lookout, and in not answering promptly whistle signals given by the ship Magnolia; and, in not putting her helm aport in order to avoid the collision, and in other respects not complying with the laws and rules governing navigation on the said Mississippi river at said point; that immediately preceding said collision and at the time, there was no one on the deck of the Esparta competent to navigate her, and that there was no licensed officer in charge; that those at the wheel directing her course were reckless, negligent, and arbitrarily refused to answer such signals as were given by the ship Magnolia; that the pilot on board the said ship Esparta was not authorized by law to pilot her up the Mississippi; that she did not promptly stop and back her engine in order to avoid said collision; and that she was in fact unmanageable at the time."

The answer of the claimant, the Tropical Fruit Steamship Company, the owner of the Esparta, denies all charges of negligence and incompetence in the navigation of the Esparta, and avers that she was properly manned, equipped, and navigated, and was in charge of a duly licensed and experienced pilot. The answer further avers that, when the ships were about one-half mile apart, the Magnolia gave a signal of two blasts, indicating thereby that she would pass on the starboard (or east) side of the Esparta; that the Esparta promptly answered this signal of the Magnolia by sounding two loud and distinct blasts on her whistle, thereby indicating that she would pass on the starboard (or west) side of the Magnolia; that the Esparta was then close in to the west bank, where it is usual and customary for ascending vessels to be, but that the Magnolia was not at that time in the usual and customary place for descending ships; that shortly after having exchanged signals as above stated, "and when said vessels were dangerously near each other, the Magnolia, without justification, and in violation of all rules and customs, blew one blast of her whistle, indicating that she would change her course and attempt to pass to the port side of the Esparta, and put her helm hard aport. The Esparta at once replied with two blasts, and immediately followed with the danger signal, reversed her engines full speed astern, starboarded her helm, and edged in as close to the bank as possible in order to avoid or minimize the collision, for the Esparta being a deeply laden and single screw vessel, had she attempted to follow said cross-signal of the Magnolia, could not have changed her course sufficiently to have avoided the collision, but on the contrary would have struck the Magnolia near her stern, and would have injured her engines and boilers, and probably sunk her. During all the interval between the first exchange of signals and the cross-signal by the Magnolia, the position of said vessels was such that it would have been impossible for the Magnolia to have passed between the Esparta and the bank. "In the meantime the Esparta had worked in so close to the west bank that when the vessels came in collision she was actually grounding, and after striking the Magnolia near her stem, moved forward but a short distance before she grounded hard and fast."

The answer claims that the collision was due to the negligence of the officers of the Magnolia; that the Magnolia was not in the proper and customary part of the river for descending vessels; that, after signaling that she would pass on the starboard side of the Esparta, the Magnolia should have stopped if she got no reply, and should have passed to starboard, if she did hear the reply of the Esparta; that she had no right to signal, by one blast, that she would pass to the port of the Esparta when the vessels were so near that they could not stop before they met; that the Esparta was so near the west bank that it was impossible for the Magnolia to pass between her and the west bank; that when the Esparta answered, with two blasts, the one blast of the Magnolia it was the duty of the Magnolia to go to starboard, as she had originally agreed to do, and as the Esparta, by her two blasts, notified her she should still do.

2. Not only the averments of the libel and answer, but the overwhelming preponderance of the evidence, shows that the proper and usual course for the Esparta coming up the river was to cross over from Dick Wright's Point, on the east bank, to the west bank under Sixty-Mile Point, and come up under that bank close to shore. And, as the libel alleges that this was the proper course for the Esparta to take, it tacitly admits that the master of the Magnolia either had actual and personal knowledge of this fact, or was chargeable with such knowledge, if he did not have it. The evidence conclusively shows that the Esparta did, in fact, follow, up to the moment of the collision, this course, which it was customary and proper and to be expected that she would follow. Capt. Field, master of the Magnolia, says that when he first saw the Esparta her lights indicated "that she was at an angle," "she was on our starboard bow," indicating "that she was coming up the river or going across the river to the bank; the natural tendency, if she had kept on her course she would have struck Sixty-Mile Point on the west bank." A. C. Nieman, first mate of the Magnolia, says that when he first saw the Esparta she "was coming around Dick Wright's Point [on the east side of the river]; that the Magnolia then blew a signal of two whistles, and received no answer, after going a little further, blew another signal of two whistles; that at that time (i. e., when the second signal was given) I should judge she [the Esparta] was over on the west bank," that "according to the general rule," when vessels are ascending the river at that locality "from Dick Wright's Point, they cross over to the west side." Nieman was asked how close the Esparta was to the west bank:

"Q. How close do you judge the Esparta was to the west bank? A. I could not say. Q. Well, couldn't you form some idea? A. No, sir; I could not, because that is only customary to go over to the west bank. I couldn't know how near she was. Q. You knew she was going to keep right under that west bank? A. She ought to have. Q. They go as close in there as they can to avoid the current? A. Yes, sir; that is the custom."

Cæsar F. d'Almboe, the second mate of the Magnolia, was extremely vague in all his testimony. He was reluctant to commit himself to any definite and exact statement on any point. He says that at the time of the second signal, the Esparta "was about in the middle of the river." He further states that the vessels collided "very near the middle of the river," "not quite in the middle of the river, a little more to the west bank, but a good ways off from the bank." This latter statement, as to the location of the vessels when they collided, is certainly incorrect; the collision took place very close to the west bank. As d'Almboe fixed the position of the Esparta at the time of the collision to be near the middle of the river, when in fact it was near the west bank, it is fair to infer that she was in the same position relative to the west bank at the time of the second signal, when he thought she was in the middle or near the middle of the river. In any case, d'Almboe's testimony is so vague and widely conjectural on all points, that I can attribute but little value to it. Paul Bjorvig, quartermaster of the Magnolia, says that when he first saw the Esparta "I had her on the starboard bow." And when the collision occurred, "we were more over to the starboard land for us. Mr. Bjorvig also testified: "I don't know that river so much;" and as regards his observation of the lights of the Esparta, as showing her position, he frankly said: "I didn't take no notice of it, there were so many officers around me.

I only looked at the wheel; the captain told me only to watch the wheel; that is all you have to do." I took notice of the wheel; I looked out for the wheel so there would be nothing wrong on my side." He did not even notice how far the vessels were apart when Capt. Field gave him the final order to port the wheel. Solely on the libelant's testimony, taken in its entirety, I should be forced to conclude that the Esparta actually took the course which custom and usage entitled her to take in that reach of the river, and that when the collision occurred she was in the precise path which it was her right, and, under the custom, her duty to take. The claimant's evidence puts this conclusion beyond question.

Capt. Arroyo, the pilot on the Esparta, testifies that when he got to Dick Wright's Point (on the east side of the river), "I crossed over under Sixty-Mile Point (on the west side of the river). That is the customary course of all vessels;" and as he was coming up under Sixty-Mile Point, the Esparta was running about 200 or 300 feet from the water's edge; when he got over under Sixty-Mile Point, "I straightened up and continued my course along the bank, like I always did." When the collision occurred, the Esparta was, he should judge, within 50 feet of the bank. Capt. W. M. Rose, master of the Esparta, says that his ship passed the Ivy just below Dick Wright's Point, and then he went to his cabin to read; he heard the Magnolia give a signal of two whistles; thereupon he rose and went on deck; "he [Capt. Arroyo] responded immediately after he heard the other signal and while he was blowing I was coming out; I was on my way out when the signal was given by the Esparta." "We had crossed over the river in the meantime, following along the west bank." Harry Long, boatswain, doing second mate's duty on the Esparta that night, says that the Esparta was not very far from the west bank, was trying to get around the point (Sixty-Mile Point) and was running straight with the bank. C. Oscar, the seaman of the Esparta on the lookout, says that the Esparta was running very close to the west bank when the Magnolia blew the first and second signals (two whistles), and was right alongside the bank when the collision took place. The above testimony establishes, I think, beyond any reasonable controversy that the Esparta, from the time she came in sight of the Magnolia, up to and at the moment of the collision, was at all times actually and clearly following the course prescribed by custom, and which the officers of the Magnolia were bound to anticipate, and did anticipate, she would follow.

3. The evidence shows with equal certainty that the customary and proper course for the Magnolia to have pursued was down the middle of the river, and that she was in the middle of the river when she first sighted the Magnolia, and continued in the middle of the river until a short time before the collision occurred. The position in the river of the Magnolia, and her course, can be most satisfactorily determined from the testimony of her own officers. Capt. Field was on deck with Nieman, his first mate, and d'Almboe, his second mate. The quartermaster, Bjorvig, was in the pilot house, at the wheel. These four men certainly knew the position and course of the Magnolia better than any one else. Capt. Field testifies that, as soon as the Esparta came in sight, he gave a signal of two whistles, to which the Esparta gave no answer. The vessels were then three miles apart. After waiting a few seconds, he gave a second signal of two whistles. The vessels were then two miles apart. That is, the distance between the vessels had diminished by one mile. The speed of the Esparta was 10¼ miles an hour, and the speed of the Magnolia was 13½ miles an hour. The Magnolia had, therefore, traveled approximately 7/12 of a mile between the point where the first signal was given and the point where the second signal was given. As regards the position in the river of the Magnolia at each of these points, Capt. Field testifies as follows:

"Q. What was the Magnolia's position in the river as regards the two banks at the time you blew the first signal of two whistles? A. As near as I could judge near the middle; in the middle, as near as I could judge. Q. What was her position at the time you blew the second signal of two blasts? A. Same position."

Nieman, the first mate, agrees on this point with Capt. Field. Nieman's testimony is as follows:

"Q. Were you nearer the east bank or the west bank, when you blew this first signal of two blasts, just above Harris Bayou light? A. We were about right in the middle of the river—as near as I could judge. Q. What was your position when you blew the second signal of two blasts? A. Still about in the middle of the river."

Nieman further shows that it was proper and customary for descending ships to keep in the middle of the river:

"Q. And at that particular time the Magnolia was about in the middle of the river? A. Yes, sir. Q. Is it customary for a descending boat at that point to come up as near over to the east bank as she can, to run the bend? A. No; not necessarily. Q. They always keep well out in the middle of the river? A. Yes, sir; in the middle of the river, to get the best effect of the current running down. Q. And keep away from the west bank? A. Yes, sir."

D'Almboe says that, when the ships first came in sight, "She [the Magnolia] was right in the middle of the river. Going down, you know, a boat makes the best time by keeping in the middle of the river." Bjorvig makes no statement, one way or the other, as to the Magnolia's position. The testimony of the captain and of the first and second mates of the Magnolia thus demonstrates that, when the vessels came in sight, the Magnolia was on her proper and customary course, and that she thereafter continued on that course for over half a mile, and after she had given two signals to inform the Esparta that she (the Magnolia) intended to continue in said course.

4. The evidence thus showing that each of the vessels, when they first came in sight of each other, was in its proper position and pursuing its proper and customary course; that the signals to continue in these courses were given by the Magnolia herself; that the Esparta continued in her proper course till the collision; but that the Magnolia got out of her course and into the course of the Esparta, and there came in collision with the Esparta—the inquiry inevitably suggests itself, when, why, and how did the Magnolia get out of her own course and come in collision with the Esparta, while the latter vessel was pursuing its proper course? Capt. Field's testimony is that, when the Magnolia reached Sixty-Mile Point, he saw the Esparta opposite Dick Wright's Point, three miles down the river. He immediately gave the signal of two whistles, indicating thereby that the Magnolia would go to the starboard of the Esparta—that is, would pass between the Esparta and the east bank of the river. He says this signal was not answered, so, after waiting a few seconds, he repeated the two whistle signal, when, in his judgment, the vessels were two miles apart. And he says that his second signal was not answered by the Esparta. Although the Magnolia had not, Capt. Field declares, received any answer to either of her two signals, nevertheless she kept on until a few minutes later, she found herself, Capt. Field thought, confronting the Esparta, head on, and in the Esparta's own course. The vessels were then within a short distance of each other. At different times Capt. Field estimated the distance separating the vessels, when he supposed he found they were coming at each other head on in the same course, at one-quarter, one-half, and three-quarters of a mile. These divergent estimates only show that Capt. Field has no fixed and certain opinion as to the distance the ships were apart, when he concluded they were coming at each other head on. They were so near that there was imminent and alarming danger of a collision, and he had no time, or was not in a sufficiently cool frame of mind, to estimate, with any approach to accuracy, the then distance between the vessels. Finding himself in this perilous position, he gave the signal of one blast, which announced that he intended to pass the Esparta on her port side—that is, that he would try to pass between the Esparta and the west bank—and he put her helm hard aport. The Esparta answered with two whistles, and put his helm to starboard, and the vessels ran together in a few seconds.

As there is conflict between the account of the matter which Capt. Field gives and that which his officers give, I will cite the material part of this testimony in the words of the witnesses. He begins by giving a brief epitome of the whole occurrence: "We left the wharf at 7:30 p. m., and proceeded down the river. We passed several vessels in the river, and at about 11:10 p. m. we sighted the lights of a steamer at about Dick Wright's Point or at

Dick Wright's Point. Now, we were then at Sixty-Mile Point, abreast the light. I sighted her green light, and blew two whistles to pass him on his starboard side. Receiving no answer, I blew two more whistles. Still receiving no answer, and the vessels changing their positions to head on, I blew one whistle, and ported my helm to pass him to port and stopped my engines. Right after blowing four whistles, I stopped and backed, receiving two from him.' Soon after collided with this steamer, which struck me about 27 feet from the stem on the port bow, turning the Magnolia completely up stream, when I headed for the bank and forced the Magnolia up on the bank, under the steamer's stern, said steamer proving to be the Esparta. That is as near as I can get at it." Distance separating vessels when first signal was given: "Q. How far apart were these two ships when you first sighted these lights? A. As near as I can judge, they were about three miles. Q. Was that at the time you blew two whistles? A. Yes, sir." Distance separating vessels when second signal was given: "Q. How far apart were these two boats, the Magnolia and Esparta, when you blew the second signal of two whistles? A. I should judge they were about two miles." Distance separating vessels when third signal (of one blast) was given: "Q. How far apart were the two boats when you blew the signal of one blast? A. I should judge they were about three-quarters of a mile, as near as I could tell. Q. How long after blowing your signal of one blast was it before you blew the danger signal? A. I did not blow any danger signal. Q. Well, for the moment we will call it an alarm signal, or a signal of four blasts? A. I should not think it was over two seconds. * * * Q. How far was the Magnolia from the Esparta at the time you blew your signal of four blasts? A. Not over a quarter of a mile; that is as near as I could judge." Capt. Field's statement that not over two seconds elapsed between the blowing of the one blast signal and the blowing of the four blasts as an alarm or danger signal is corroborated by Nieman, who says: "You couldn't hardly tell the difference between the one blast and the danger signal; it was right on top of it; it was so quick." The distance between the vessels was then, within a few feet at most, the same when the one-blast signal was given, as when the four-blast danger signal was given, and Capt. Field here estimates that distance at not over a quarter of a mile. The next citation from Capt. Field's testimony shows that he himself regarded the distance between the vessels as being the same when the one blast signal and when the four blast signal was given:

"Q. I understood from your answer a few moments ago, you stated at the time the signal of one blast was given, you were not more than one-quarter of a mile from the Esparta? A. Yes, sir. Q. That is what you testified to? A. Yes, sir. Q. Now, I call your attention to your testimony before the local board of inspectors, given on the 15th day of November, 1905, during which you were asked this question: 'And about how far apart when the one blast was given? A. Half a mile.' Which of your statements is correct? A. That answer would be correct. Q. Which answer there? A. That one there—'Half a mile.'"

Capt. Field thus appears to have stated at different times that when the last signal—one blast—was given, the ships were one-quarter of a mile apart, that they were half a mile apart, and that they were three-quarters of a mile apart. I can only conclude that his ideas as to the distance the vessels were apart when the one blast signal was given are utterly vague, and the merest and loosest guess work. I cannot therefore regard Capt. Field's testimony on this point as of any serious value in helping to ascertain the distance apart of the vessels when the last signal was given. Capt. Field's failure to hear any answer to the first two signals given by the Magnolia:

"Q. Captain, at the time you blew the first signal of two whistles, what answer did you get? A. None that I heard. Q. At the time you blew the second two whistles, what answer did you get? A. None that I heard. Did you get any reply? (To the first signal.) A. No, sir; not to my hearing. Q. Did you get any reply to that signal? (The second.) A. No, sir, not to my knowledge; I did not hear any. Q. Now, I understand that you testified that you got no reply to your first and second signals? A. I heard no reply. Q. Your hearing defective in any way? A. Not that I know of. Q. Ever been treated for your eyes? A. No, sir. Q. For your ears? A. No, sir."

Capt. Field's statement that he did not inquire of the officers near him whether they had heard any reply to the signals and did not remark on the failure to reply. If Capt. Field heard no reply to either of the first two signals, it is hardly conceivable that he would not have turned to one or both of the officers standing by him and ask if they had heard a reply or at any rate have made some remark on such an extraordinary omission. But he says he did not. His officers and the quartermaster, in substance, contradict him.

Capt. Field: "Q. Did you ask any one aboard whether they heard any answer from the Esparta? A. I did not. * * * Q. Now, then, you say you heard no response? A. No, sir. Q. Did you ask anybody in the pilot house whether they heard any? A. No, sir. Q. You made no inquiries of the other two officers? A. No, sir. Q. Or the quartermaster? A. No, sir. Q. Did you say anything to the quartermaster, or to the other two officers standing there, about not hearing the signals? A. Not that I remember. Q. I understood your testimony to be that, although, you gave two signals of two blasts each, waited a reasonable time after each of these signals and hearing no reply, you made no inquiries of any of your officers or crew whether they heard any reply? A. I made no inquiries. Q. Do you recall the fact that Mr. Nieman, immediately after you had blown your second signal of two whistles called out to you, 'Cross-signal; look out'? A. No; I do not recall him saying that. I do not remember hearing it. I think he stated that in his testimony before the local inspectors." The testimony of the mates, Nieman and d'Almboe, and of the quartermaster, Bjorvig, tends to show very conclusively that Capt. Field's memory was at fault when he gave the testimony just cited.

Nieman: "Q. Did the Esparta answer those two blasts (of the Magnolia's second signal)? A. They answered with one. Q. You mean you only heard one? A. That is all I heard. Q. Did you make any comment on that fact? A. I told the captain right away: 'You got a cross-signal; look out.' Q. Did the captain ask you after the first signal of two blasts whether you heard any answer from the Esparta? A. No; he had not any time to ask, as soon as I heard it, I reported it to him. Q. No; I mean the first signal of two blasts you gave the Esparta and got no response, so you say; did you call the captain's attention to the fact that you got no response? A. Yes, sir. Q. What did the captain say when you said, 'Cross-signal; look out'? A. He was then standing in the pilot house at the time, and he went right to the whistle string and blew one whistle, and then four short blasts, and stopped the engine and reversed them as soon as he could."

D'Almboe: "Q. Did the captain ask you whether you heard an answer to his first signal? A. No; he asked the chief mate. Q. What did the chief mate tell him? A. He said he did not hear any answer."

Bjorvig: "Q. Just tell the board what you know about it? A. Well, I was standing at the wheel, and I saw a steamer coming up the river, and I saw his topmast headlight and his green light, and I had her on the starboard bow, and the captain told me to take him a little closer, and he blew two whistles for him, and I heard the captain say, 'You hear the answer;' and I said, 'No, sir;' and he said, 'I will give him two blasts more,' and then I heard the Esparta's whistle, and I can't exactly say whether it was one or two—and I heard the second mate say, 'What is the matter with that boat, he gave us only one blast?'—and then the captain came to the pilot house, and blew one whistle for him, and told me to port [the] wheel, and then I got the Esparta right ahead, and we got port wheel and his green light came over on the port bow, and then I heard four whistles—four short whistles—four from us and four from the Esparta, and then she came right to us. That is all I can say."

Capt. Field's conjecture as to how the Magnolia got out of her course: The evidence shows that when the Magnolia gave her first and second signals, each of two blasts, she was in her proper course in the middle of the river. If she had simply pursued this course, there would have been no collision nor danger of collision. But somehow she got out of her course and went over to the west and into or dangerously near the rightful path of the Esparta. This deviation by the Magnolia to the west was not intentional, for Nieman testifies that the proper and customary course of the Esparta was on the west side of the river, and this testimony is strongly corroborated by several other wit-

nesses, and scarcely called in question by Capt. Field. Capt. Field was asked if he knew of the custom for vessels coming up the river to run the points, and for vessels descending to keep in the middle? The captain was decidedly evasive in his reply.

"Q. What is the custom in regard to navigating the Mississippi river where there is a bend? A. Now, that is a peculiar question which requires a peculiar answer. Small vessels usually follow the bend in going down; also they cross· from one point to another point coming up. While some large vessels follow this custom, others keep right straight course, going across from point to point, while others keep to the center of the river. Q. Does it depend upon the pilot who is on the ship? A. It depends a great deal on the pilot; it depends on the current, and it depends on the size of the boat and the speed of the vessel. Q. Then, I take it there is no invariable custom? · A. No, sir."

The libel alleged that "there was a bend in the river at this particular point, and it was a pilot custom for ascending boats to cross to the right bank at this point," etc. The defendant, therefore, objected to Capt. Field's testimony as being in conflict with the averments of the libel. Capt. Field made a re-port of the collision to the local inspectors, and in that report among other things, he said: "* * * then he (the Esparta) was at a point known to river men as Dick Wright's, and as it was the custom for ascending steamers to cross the river from that point to the west bank, I blew two whistles to pass to starboard and astern of him, which signal he did not answer." The cap-tain, then, by his own admission unquestionably knew the custom as to the course of ascending steamers from Dick Wright's Point to Sixty-Mile Point, even though he may have had no knowledge of the general custom all the way up. The only essential thing is that he did know and admits he knew the custom governing the Esparta's course in the reach where the collision oc-curred. Knowing that custom, he would naturally assume and expect, par-ticularly as it fixed the path of least resistance for the Esparta's course, that the Esparta would follow her custom-fixed and convenient course, until and unless she indicated a contrary intention. This she never did. How, then, did the Magnolia come to find herself out of her own course and over to the west in the course of the Esparta? Capt. Field was asked to explain this change of his vessel's position in the river. To steer the vessel to the west side of the river, it was necessary to port the helm. After the captain had stated several times that he never ported the helm of his ship until after his last signal of one blast, the examination proceeded:

"Q. How is it then that your ship, between the time you blew your first sig-nal of two blasts, and the time you blew your third signal of one blast, had worked over to the west bank? A. That is easily understood. You can't in the nighttime tell whether you are in the center of the river or not. She work-ed over by the time I blew her." This won't do; as all the libelant's ex-culpatory testimony is based on the assumption that the night was clear enough to enable the witnesses to say where the ships were at various times. And the captain had already testified that he could go down the river on a dark clear night and tell where he was all the time. "Q. You mean at the time you blew your two whistles? A. No; I mean from the time I blew the one whistle to the time when she struck, that she had time to work over to the bank." This answer was obviously given without reflection, for after the signal of one blast the helm was put hard aport, and this ship was purposely steered to the west bank. "Q. How is it she worked over from the middle of the river to about one-third of the distance of the west bank, between the time you blew the first signal of two blasts and the time you blew the third signal of one blast? A. That might have been done by bad steering. Q. Who was steering at the time? A. The quartermaster." When Capt. Field at-tributed to bad steering the working of his vessel to the west, he tacitly aban-doned his first suggestion that it was due to the darkness of the night. Not only the libel alleges, but several witnesses testify, that it was a clear night, with no moon shining. The principal, if not the˙exclusive, explanation of his ship's departure from her course on which Capt. Field rests is that she was badly steered. This explanation admits fault in the navigation of the Mag-nolia. This fault was all the greater as Capt. Field seems to imply that, not-

withstanding the fact that he heard no answer to his two first signals, he still' expected that the Esparta would pursue the customary course of vessels coming up the river.

"Q. Now, when you blew your first signal of two blasts and got no reply as you say from the Esparta, what did you think the intentions of the Esparta were? A. My thoughts of his intentions were he was going to keep up the same as he was going. Q. Keep up the same as he was going? A. Yes, sir. Q. You mean he was going to continue in the same direction he was pointed? A. Exactly. Q. You had no doubt as to what he was going to do? A. No, sir; I had no doubt. He should have answered my signal and kept on his course. Q. As he did not answer your signal, what did you think about it? A. Then I blew my second signal. Q. No, what did you think about it, when he did not answer your signal? A. I thought he had not heard it. Q. Then, you did not know what he was going to do—how he was going to answer? A. I supposed he would answer the same. Q. But you did not know it? A. I did not know it; no, sir. Q. When you blew your second signal of two blasts and you got no reply, what did you think he was going to do? A. I could not tell what he was going to do. Q. You did not know what he was going to do? A. I did not know what he was going to do then."

While Capt. Field might not know what the Esparta was going to do, after he failed to hear a reply to his signals, he had absolutely no ground for assuming that she was going to deviate from her course, or pursue some course other and more difficult than that which was usual and customary for vessels ascending the river, and which he and his first officer, Nieman, had observed that the Esparta was actually pursuing. The obvious inference from the Esparta's silence, if she was silent, was that she had not heard the Magnolia's signals and that she would follow the usual path of vessels coming up the river. Assuming that the testimony of libelant's witnesses—that the Magnolia was in the middle of the river when the second signal of two blasts was given—is true, it follows that, after the giving of this signal, the Magnolia, through bad steering, and not in obedience to any wish or purpose of the captain, but contrary to his wish and purpose, worked out of her course and went to the west into or very near to the path of the Esparta. This brings us to the consideration of the last problem in the case.

5. The Magnolia having given two signals to indicate that she was going down the middle or east bank of the river, and then having through bad steering, carelessly worked out of her actual and signal-announced course, and having come up suddenly in front or nearly in front of the Esparta, could the collision that ensued have nevertheless been avoided by proper navigation on the part of the Esparta? In other words, though the danger of collision arose through the negligence and fault of the Magnolia, would that collision have been avoided if the Esparta had even then obeyed the rules of navigation? If the Esparta could, notwithstanding the situation brought about by the negligence of the Magnolia, have avoided collision after the situation became apparent to her officers by proper and skillful navigation, she would be liable for a collision resulting from her failure to use such proper and skillful seamanship. It makes no difference how or by whom a dangerous situation is created, it is still the duty of every one perceiving that situation, and acting with reference to it, to avoid it if he has time and means to avoid it. Say the Supreme Court: "This court has repeatedly held the fault, or even the gross fault, of one vessel does not absolve the other from the use of such precautions as good judgment and accomplished seamanship require." The Albert Dumois, 177 U. S. 240, 20 Sup. Ct. 595, 44 L. Ed. 751. Before attempting to apply this principle, we must first ascertain as accurately as possible the exact situation in point of physical fact when the Magnolia gave her last signal, indicating that she proposed to change her course from the course indicated by her first two signals and to pass the Esparta on her port, or west side.

Position of the Vessels. Capt. Field says that, when the one blast signal was given, the Esparta was head on or nearly so; she was showing "all her lights, red, green, and two masthead lights." He had already stated that the vessels were three miles apart when he gave his first signal—two blasts— and the Esparta was showing her green light; that they were two miles apart

when he gave his second signal—two blasts, and the Esparta was then still showing her green light and was not showing her red light; and that they were one-quarter, one-half, or three-quarters of a mile apart when he gave his third signal—one blast. Capt. Field thus makes the distance from the point where the second signal was given to the point when the third signal was given seven-twelfths of 1¼ miles, or seven-twelfths of 1½ miles, or seven-twelfths of 1¾ miles—according to the calculation that his ship traveled about seven-twelfths of the lessened distance between the vessels. In any case, he makes a considerable distance between the point at which the second signal was given and the point at which the third signal was given. Nieman gives a very different account. He says when the first signal was given the vessels were about three miles apart, and the Esparta was showing then her green light; that when the second signal—two blasts—was given, the vessels were about ½ mile apart, and the Esparta was then showing both red and green lights, and answered with one blast, and thereupon Capt. Field at once answered with one blast and the danger signal of four blasts. The conflict between the testimony of these two witnesses can be best appreciated by placing their ipsissima verba in juxtaposition.

Lights Showing on Esparta When Second Signal was Given. Capt. Field: "Q. What lights were showing on the Esparta when you blew the second signal of two whistles? A. Showing the same lights, the green light was showing with a masthead light and range light. Q. Was the red light showing? A. No, sir." Of course the vessels could not be dead ahead or head on, or nearly so, if only the green light of the Esparta was showing.

Nieman: Says the Magnolia was at Harris Bayou light when the Esparta was first sighted coming round Dick Wright's Point about 3 miles off. Then, "the first signal of two blasts was given by the Magnolia immediately on seeing the Esparta."

So far Nieman and Field agree, the ships were three miles apart when the first signal of two blasts was given, and the Esparta was then showing only her green light. Now, as to the second signal of two blasts.

Nieman: "A. We blew the first signal of two whistles. Q. Did you get an answer from the Esparta? A. No, sir; not to the first signal. Q. What was done on the Magnolia, then? A. We waited the usual time, and then blew again two whistles. Q. Did you get an answer to that one? A. Yes, sir; it was answered with one. Q. What was the position of the two ships at this time? A. We saw both the Esparta's green and red lights, also the masthead light. Q. About how far apart were the two vessels? A. Well, then, I should judge about half a mile. Q. Then, they were apparently dead ahead? The Esparta was apparently dead ahead? A. Yes, sir. * * * Q. What lights did you see on the Esparta? A. I saw both red and green lights and masthead lights. Q. What was done on the Magnolia after this? A. The captain blew him one whistle and four quick toots on top of it, and ported his helm."

According to Nieman, the vessels were dead ahead, and the Esparta was showing both her red and green lights when the second signal was given. According to Field, the Esparta was then showing only her green light. According to Nieman, when the second signal was given, the vessels were only half a mile apart; according to Field, they were then two miles apart. According to Nieman, when the Magnolia gave her second signal of two whistles, the Esparta answered with only one whistle, and thereupon the Magnolia blew one whistle, and ported her helm. According to Field, the Esparta did not answer the second signal at all, and he continued his course a considerable distance, and then gave a signal of one whistle. Both Nieman and Field agree that when the Magnolia blew the signal of one whistle the Esparta promptly replied with a signal of two whistles.

D'Almboe, the second mate, agrees substantially with Nieman as to the order in which the signals were given: "Q. Were there any signals exchanged at that time? (When the ships first came in sight of each other.) A. Yes, sir; I came up there, and when I saw the lights, the captain ordered the chief mate to blow two blasts of the whistle. Q. On the Magnolia? A. Yes, sir. Q. Were those two blasts blown? A. Two blasts on the Magnolia were blown, yes, sir; I heard them distinctly. The captain blew two blasts, but then we

did not get any answer, and then the captain ordered the mate to blow two blasts more, and then the other vessel blew one blast—the approaching vessel blew one blast. Q. How far were those two vessels apart at the time the other vessel blew one blast? A. I could not say. * * * Q. What lights were visible on the Esparta at that time? A. I saw her masthead light and green light. Q. At the time the Esparta blew one blast? A. Yes, sir. Q. What was done on the Magnolia? A. The Esparta blew one blast, as I tell you, then the Magnolia, then the captain of the Magnolia, blew one blast himself on the Magnolia, then the Esparta answered that with two blasts, and, of course, then the captain of the Magnolia, he blew the danger signal—that is, four short blasts, and stopped both engines, and reversed them full speed astern, both engines. Q. Well, now, what lights did you see on the Esparta at the moment she blew this signal of one blast in response to the second signal of the Magnolia of two blasts—what light was she showing to you? A. I saw all the lights, then. Q. Of the Esparta? A. Yes, sir. Q. You mean both side lights? A. I saw all the lights." As d'Almboe says, the Esparta was then in the middle of the river, he places her where she must have been going straight against the swiftest part of the current, which was certainly a singular course for the Esparta to take. Concerning the lights visible on the Esparta at the time she answered with one blast, d'Almboe first says he saw the green light, then says he saw all the lights.

Bjorvig's account is extremely general, but he seems to give the signals in the same order as Nieman and d'Almboe. He says: "I was standing at the wheel, and I saw a steamer coming up the river, and I saw his topmast headlight and his green light, and I had her on the starboard bow, and the captain told me to take him a little closer, and he blew two whistles for him; and I heard the captain say, 'You hear the answer?' and I said, 'No, sir;' and he said, 'I will give him two blasts more,' and then I heard the Esparta's whistle, and I can't exactly say whether it was one or two; and I heard the second mate say, 'What is the matter with that boat; he gave us only one blast?' and then the captain came to the pilot house and blew one whistle for him, and told me, 'Port wheel,' and then I got the Esparta right ahead, and we got port wheel and his green light came over on the port bow, and then I heard four whistles—four short whistles—four from us and four from the Esparta, and then she came right to us. That is all I can say."

Williams, the engineer of the Magnolia, declares unequivocally that, when the Magnolia gave her signal of two whistles, he heard a reply of two whistles. He seems not to know anything of the Magnolia's first signal. But he did hear the Magnolia give one signal of two whistles, the Esparta reply with two whistles, and then the Magnolia rejoin with one whistle. "Q. Did you hear the Magnolia when she first signaled this ship, which afterwards turned out to be the Esparta? A. I did. Q. What signal did she give? A. Two. Q. Did you hear the Esparta answer that signal? A. I did, she gave an answer of two signals. Q. Did you hear the Magnolia give any other answering signals? A. One."

According to Capt. Field, the order of the whistles and the distances of the vessels from each other were as follows: First Signal: 1. Ships 3 miles apart. a. From Magnolia—Two whistles. b. From Esparta—No answer. Esparta to starboard of Magnolia. Second Signal: 2. Ships 2 miles apart. a. From Magnolia—Two whistles. b. From Esparta—No answer. Esparta still to starboard of Magnolia. Third Signal: 3. Ships either ¼, ½, or ¾ of a mile apart. a. From Magnolia—One whistle. b. From Esparta—Two whistles. c. From Magnolia—Four whistles. Collision. Esparta head on with Magnolia.

According to Nieman, the above table should be as follows: First Signal: 1. Ships 3 miles apart. a. From Magnolia—Two whistles. b. From Esparta —No answer. Esparta to starboard of Magnolia. Second Signal: 2. Ships ½ mile apart. a. From Magnolia—Two whistles. b. From Esparta—One whistle. Esparta head on with Magnolia. Third Signal: 3. Ship practically same distance as in 2. a. From Magnolia—One whistle. b. From Esparta— Two whistles. Esparta head on with Magnolia.

D'Almboe would agree with Nieman's table except as to distances, about

which he is widely conjectural, and except his two contradictory statements as to the Esparta's position at the time of the second signal. Bjorvig, too, would agree with Nieman's table with the distances eliminated, and with the modification that the ships were not head on until after he had ported his helm after the Magnolia had given her third signal of one whistle. Now, which of these discrepant stories am I to believe? When the Magnolia gave her second signal, were the ships two miles apart, as Field says? or, were they one-half a mile apart as Nieman says, with faint corroboration from d'Almboe? Did no answer come from the Esparta to the Magnolia's second signal, as Field says? or, was there an answer of one whistle, as Nieman and d'Almboe, say? or, an answer of two whistles, as Bjorvig seems inclined to admit, and as Williams positively asserts? When the Magnolia blew her second signal, were the ships still to the starboard each of the other, as Field says? or, were they then head on as Nieman says with D'Almboe's half self-contradicted acquiescence? or, were the ships not head on to each other, until after the Magnolia had given her third signal of one blast, and after her helm had been ported, as Bjorvig says? Did the Magnolia's signal of one whistle follow in immediate sequence on her second signal of two whistles, and the Esparta's answer thereto of one whistle or two whistles, so that these signals were practically one continuous interchange, consisting of two whistles from the Magnolia, one whistle from the Esparta (or two) and lastly one whistle from the Magnolia, as Nieman, d'Almboe, and Bjorvig say? or did the Magnolia, after giving its second signal of two whistles, then go two-thirds or three-fourths of a mile down the river, before giving her third signal of one whistle, as Field says? Finally, how far apart were the ships when the Magnolia gave the one whistle signal? Was the distance one-fourth of a mile (1,320 feet) as Field says in one place? or one-half a mile, as he says in another place? or three-fourths of a mile, as he says in still another place? or is it possible for me to determine from the evidence, with even the smallest degree of certainty, how far the ships were then apart? As far as I know, each of these witnesses is equally reliable and honest, and they all had the same opportunities for observing the facts about which they testify. They were practically in the same position on board the Magnolia. They were all naturally under a strong bias to exculpate themselves from the charge of negligence in navigating the ship in which the President was traveling in their charge. I can only say that from the conflicting testimony of the witnesses for the libelant, I am unable to determine the situation immediately preceding the collision, with such certainty as to conclude that in that situation the collision could and should have been avoided by proper navigation on the part of the Esparta. The negligence and fault of the Magnolia having led to a situation of danger, and one likely to bring about a collision, it was incumbent on the Magnolia, clearly to prove that, notwithstanding this negligence on her part, it was still possible for the Esparta to have averted the collision. The libelant has furnished no such proof; every act and every fact in the situation is left in doubt.

6. If Capt. Field was correct in his statement that the Esparta did not answer either of the first two signals, and that, after she failed to answer his second signal, "he did not know what she was going to do," then he seems clearly to have violated rule 3, of the pilot rules. "If," says rule 3, "when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle; and, if the vessels shall have approached within half a mile of each other, both shall be immediately slowed to a speed barely sufficient for steerageway until the proper signals are given, answered and understood, or until the vessels shall have passed each other." Capt. Field says that, when the Esparta did not answer his second signal, "he did not know," "he could not tell," what she was going to do. Yet he did not, either immediately or at any time, give the signals required by rule 3, to elicit a signal from the approaching ship, and agree upon a course with her, but proceeded down the river without slacking his speed. His omission to give the signals required by rule 3 was negligence or recklessness on his part. Had he promptly complied with that rule, he would no doubt have elicited at

once an unmistakable answer from the Esparta, and the collision would never have occurred. And if, at the time of the second signal, the ships were within half a mile of each other, as Nieman and d'Almboe say they were, then it was further incumbent on Capt. Field to slow down to a speed "barely sufficient for steerageway." I think it very probable, from the preponderance of libelant's own evidence, that the distance separating the ships was then less than half a mile. Capt. Field should therefore have slowed up his boat until he had received a proper signal in reply to his. This, at any rate, was the obvious and imperative dictate of prudence in the situation. He could not possibly be very certain of the distance on a dark night. Experience teaches us all, landsmen as well as seamen, that there is nothing so difficult or rather so almost impossible as to estimate with any degree of accuracy the distance from us of a light in the dark. Articles 27 and 29 of Act Aug. 19, 1890, c. 802, § 1, 26 Stat. 327, 328 (U. S. Comp. St. 1901, p. 2871), expressly impose upon masters the obligation to pay due regard to the exigencies of each particular case.

"Art. 27. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

"Art. 29. Nothing in these rules shall exonerate any vessel or the owner or master or crew thereof, from the consequences of any neglect to keep a proper lookout, or, of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

By their own terms, the rules are not so ironclad that literal compliance with them always exempts from liability, nor does a departure from them always entail liability. The action of a master is controlled by the special circumstances of the case as well as by the rules. Now, in the present case, the Esparta, as Nieman knew and admits, and as I think Field and Bjorvig and d'Almboe also knew, was coming up around the west bank; that is, she was following an arc of a circle. Every one of the officers of the Magnolia knew this fact. Her general position and course was to the starboard and west of the Magnolia. But the Esparta was hugging the west bank, and therefore her course was not a straight line, but was an arc parallel to the arc of the west bank. In following this course, she was bound to reach a point in her course, where, for a brief time, she would show both her lights to a boat further out in the river than she was. But Capt. Field ought to have known that this exhibition of two lights by the Esparta was merely an incident in her following a circular course around the west bank, and did not indicate any change of course by the Esparta. If the Esparta had been approaching him on a straight course, in which she exhibited only her green light, and had suddenly exhibited both lights, he would have been justified in inferring that the Esparta had changed her course and intended to cross his course on the port side, but in the existing situation under the "special circumstances" of this case, such change of lights by the Esparta was only what was certain to occur at some point in her course around the point, and did not warrant Capt. Field in supposing that the Esparta was changing her course and crossing him on his port side. Yet, he seems rashly to have jumped at this conclusion, and precipitately to have changed his own course, and plunged across the course of the Esparta, although that course was really to his starboard, as he ought to have known and properly did generally know. In other words, the Esparta was pursuing a course to the starboard and west of the Magnolia, but in this course there was a short space in which the Esparta would, while following the course still necessarily, exhibit both lights. The fact, no doubt, was that the Magnolia had for some reason drifted far out of her intended course in the middle of the river, and had gotten much nearer the Esparta than the officers of the Magnolia were aware. While the Esparta exhibited only her green light, the officers of the Magnolia felt no apprehension, and paid no special attention, but when the Esparta reached that portion of her circular course where she exhibited both lights, then she loomed on the vision of the officers of the Magnolia 'big as an ocean liner,' as Capt. Field expresses it, and for a moment they forgot that the exhibition of two lights by the Esparta

was a necessity somewhere in her circular course, with the Magnolia drifting steadily to the westward, and did not in the existing circumstances indicate any change of course by her. This mistake was probably confirmed by the fact that Capt. Field thought he heard only one whistle from the Esparta, and such a signal would have indicated that the Esparta had changed her course and intended to pass on his port side, but as Bjorvig recognized, and Williams, the engineer of the Magnolia, admits, and as the witnesses for the Esparta abundantly prove, the signal of the Esparta had been two whistles and not one. The evidence, therefore, does not, in my opinion, establish that the Esparta's course ever was dead ahead with the course of the Magnolia, until the Magnolia purposely changed her course from starboard to port, and rushed suddenly across the course of the Esparta, which the facts of the collision show must then have been much nearer to the Magnolia than the officers of the Magnolia realized.

Having reached this conclusion, I necessarily find that the situation of the ships did not require or justify the application of rule 1, which requires vessels "approaching" each other head to head, or nearly so, to give one whistle, and each to pass to the port side of the other. The evidence does not show that, when the Magnolia gave one whistle and ported her helm, the Esparta was "approaching" her head to head or nearly so. The evidence and inference fairly to be based thereon, show only: (1) That the Esparta was pursuing her proper course along the west bank, following the arc of a circle. (2) That at some point in this course, and while strictly following it, the Esparta would exhibit both her red and green lights, without departing from her course, but as the necessary consequence of curving with the course. (3) That the officers of the Magnolia ought to have known this fact, but seem to have forgotten it. (4) That the officers of the Magnolia forgetting the real cause and significance of the appearance of two lights on the Esparta, and incorrectly attributing their appearance to a change of course by the Esparta, assumed the Esparta was "approaching" head on, and acted under this misapprehension. I am satisfied, therefore, that the evidence of the libelant shows that the collision was brought about solely by the fault of the Magnolia. This conclusion is strengthened when the evidence on behalf of the Esparta is further considered. It is evident that no one on the Esparta heard the Magnolia's first signal of two whistles, given when the vessels were three miles apart. All the witnesses on the Esparta testify that they heard: (1) Two blasts from the Magnolia. (2) Two blasts from the Esparta, in immediate reply. (3) One blast from the Magnolia.

The Esparta was being piloted by Capt. Patrick F. Arroyo, a licensed river pilot of long experience, and thoroughly familiar with the river between New Orleans and the Jetties. He has made several thousand trips as pilot between those points. He says: "The Magnolia blew me two whistles." "I immediately answered with two whistles." "I should judge, about two minutes afterwards, she blew me one whistle and I answered her again with two whistles." "I immediately blew the danger signal; I stopped and reversed my engines; I starboarded my helm, to keep her (the Esparta) in the bank—to keep her from running into her as much as I could, to give her the whole river." The captain thinks the ships were one mile apart when the signal of two whistles was blown, and about 1,000 feet apart when the Magnolia blew her signal of one whistle. If the Magnolia was going 13½ miles an hour she was going 1,177 feet per minute. And, if the Esparta was going 10¼ miles an hour, she was going 895 feet per minute. In 30 seconds, the Magnolia would advance toward the Esparta 588 feet; and the Esparta would advance towards the Magnolia 447, and in 30 seconds it would seem to be hardly possible to stop and reverse so as to effect any serious diminution in the speed of either vessel. So, that, if the ships were 1,000 feet apart, despite all they could do, they would probably be together in 40 or 45 seconds at most. Every witness in this case testifies that the Magnolia's second signal was that she would pass to the starboard of the Esparta. All the witnesses for the Esparta, Capt. Arroyo, Capt. Rose, C. Oscar, Dr. Preis and Harry Long, testify that the Magnolia gave a signal of two blasts, and the Esparta immediately answered with two blasts, and then the Magnolia gave a signal of one blast, and that led to

the disaster. It is also shown by the testimony of the Esparta's witnesses that she was running about as close as she could get to the west bank.

The testimony is far from showing that if the Esparta had agreed to the change of course proposed by the Magnolia's one blast at the last moment the collision would have been avoided. Proof of this is obviously impossible, where, as in this case, all the data are so largely conjectural. Though the evidence scarcely warrants a very positive opinion, I am strongly inclined to believe that Capt. Arroyo acted with good judgment in throwing the Esparta hard to starboard. If he had not done so, I believe the Magnolia would have been struck nearer the stern and probably sunk. At any rate, the Esparta was in her proper course, and the Magnolia had signaled her to keep it, and she had properly replied to that signal. Then, without justification, and when the vessels were almost on each other, the Magnolia signaled that she intended to go to port instead of to starboard as agreed. The Esparta at once replied, refusing to change the previously agreed course, as she clearly had the right to do. And the evidence convinces me that she not only had the right, but, all things considered, it was the safest thing she could do. It was then the duty of the Magnolia to herself adhere to the agreed and customary course, but she persisted in attempting to cross on the course to which she had unwarrantably changed at the last moment. The Esparta is not to blame if the Magnolia, through bad steering, drifted from the agreed course into or dangerously near the course of the Esparta, and mistook the Esparta's signals and course. The Esparta committed no fault so far as the evidence shows, and she cannot be held liable on the mere unproved hypothesis that if she had done something other than what she did the collision might not have occurred.

The libel must therefore be dismissed, with costs.

Rufus E. Foster, U. S. Atty.

W. B. Spencer and Charles P. Cocke, for appellee.

Before PARDEE and McCORMICK, Circuit Judges, and NEWMAN, District Judge.

PER CURIAM. On full consideration of the evidence, we reach the same conclusions as the District Judge, as set forth in his opinion found in the transcript.

The decree of the District Court is affirmed.

―――――――

TOMPKINS et al. v. CREIGHTON–McSHANE OIL CO. et al.

(Circuit Court of Appeals, Fifth Circuit. March 10, 1908. On Rehearing, April 3, 1908.)

No. 1,734.

1. EVIDENCE—EXTRINSIC EVIDENCE TO EXPLAIN DEED—IDENTIFICATION OF SUBJECT-MATTER.

Where a deed made in 1840 purporting to convey land certificates issued by the Land Commissioners of a Texas county was inexact and ambiguous in its description, external evidence was admissible to identify a certificate intended to be conveyed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, §§ 2116, 2117.]

2. PUBLIC LANDS—DISPOSAL OF TEXAS LANDS—VALIDITY OF GRANT.

The Texas statute of August 28, 1856 (Pen. Code 1857, art. 244), prohibiting any district surveyor from "being concerned in the purchase of any right, title or interest in any public land in his own name or in the